GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Jonathan M. Rotter (#234137)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

*Liaison Counsel for Lead Plaintiff*
*and the Proposed Plaintiff Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PANTHERA INVESTMENT FUND L.P., Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>H.C. WAINWRIGHT & Co., LLC, MARK VIKLUND, and OREN LIVNAT,<br><br>Defendants. | Case No: 2:17-cv-7926-JAK-AS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Court-appointed Lead Plaintiff Panthera Investment Fund L.P. ("Lead Plaintiff" or "Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, Plaintiff's counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by MannKind Corporation ("MannKind") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and securities analyst reports issued and disseminated by Defendants H.C. Wainwright & Co. ("Wainwright") and Oren Livnat ("Livnat"); and (c) review of other publicly available information concerning Wainwright, Livnat, and Wainwright's Chief Executive Officer Mark Viklund (collectively, "Defendants"), and MannKind. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a securities class action against Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder. Plaintiff brings this action on behalf of itself and all other persons or entities that purchased MannKind securities between 4:03 AM Pacific Time on October 10, 2017 (7:03 AM Eastern Time) and 9:02 PM Pacific Time on October 10, 2017 (12:02 AM Eastern Time on October 11, 2017) ("Class Period"). Lead Plaintiff alleges that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate MannKind's stock price through Wainwright's issuance of a price target and buy rating (the "Note") and then a research report on MannKind, titled "A Breath of New Life with Afrezza Turnaround Story; Initiate with Buy and $7 Target" and authored by Livnat (the "Report") that were materially misleading for the following reasons. First, the Note and the Report

both included a price target of $7.00 per share for MannKind despite Defendant's knowledge, as MannKind's exclusive placement agent, that a highly dilutive stock offering of more than 10 million MannKind shares (the "Offering") at a negotiated price that would be materially below the target price and MannKind's market price would be announced just hours after the close of trading that day (a fact that was not disclosed in the Report). Second, Defendants' Report stated that Defendants expected that MannKind would recapitalize in the near term but did not disclose that Defendants knew that MannKind would announce a highly dilutive below-market price and target price Offering the same day. Third, Defendants' Report stated that Wainwright will seek compensation for investment banking services from MannKind within three months without disclosing that Wainwright was at that very moment providing investment banking services to MannKind in connection with an Offering that would be announced just hours after the close of trading that same day.

2. On the morning of October 10, 2017, Wainwright, a leading specialty investment bank focused on the healthcare industry, initiated analyst coverage of MannKind, a Westlake Village, California-based pharmaceutical company. Wainwright, through analyst Livnat, first issued a price target of $7.00 for MannKind stock at 4:03 AM Pacific Time, then published the full Report on MannKind two hours later. At the time, MannKind stock was trading at $5.33 per share. The Report repeated the $7.00 price target, stated that Wainwright "expected" MannKind to recapitalize in the "near term," and alluded to an investment banking transaction that Wainwright would perform for MannKind "within three months." The Report did not mention that, in less than a day, MannKind would announce a highly dilutive stock offering for more than 14% below the Report's price target.

3. The Report, issued by a respected investment banking firm with a longstanding relationship with MannKind, sparked a surge in MannKind's stock, causing it to rise by 26% from $5.33 to $6.71 on October 10, 2017 (and as high as

$6.96 in intraday trading), on extraordinary volume, 9.6 times the average daily trading volume over the previous three months.

4. That same day, at 9:02 PM Pacific Time, MannKind announced that it would conduct a 10,166,600 share Offering (representing nearly 12% of MannKind's trading float) at a discounted price of $6.00 per share (more than 14% below the Report's $7.00 target price) for which Wainwright would serve as the Placement Agent.

5. The following trading day, MannKind's stock immediately and predictably declined materially, from $6.71 to $5.47 per share (and as low as $4.99 in intraday trading), a decline of 18.5% on volume that was 6.7 times the three-month average.

6. The Report misled the investing public as evidenced by the significant surge in the price of MannKind's shares in reaction to the misleading Report, and the material decline in that share price the very next day once the previously-concealed information concerning the Offering was revealed to the market. Investors who purchased MannKind shares during the Class Period (*i.e.*, on October 10, 2017), thus paid artificially inflated prices for their shares and were injured hereby.

## II. JURISDICTION AND VENUE

7. The claims asserted herein arise under Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and under Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts giving rise to the alleged fraud or the effects of the fraud have occurred in this Judicial District, including Defendants' due diligence with respect to MannKind's Offering, and

MannKind's execution of the Placement Agency Agreement with Defendant Wainwright with respect to that Offering. Similarly, a substantial portion of the information contained in the Report was derived from or gathered in this District (where Mankind is headquartered). *See* Oct. 2, 2017 Tr. Of Business Call Update (stating that "[w]e had analyst [*sic*] tour our factory last week").

10. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

11. Lead Plaintiff, as set forth in the Certification filed previously with the Court, purchased MannKind securities during the Class Period, and suffered damages as a result of Defendants' conduct and the federal securities law violations asserted herein.

### B. Defendants

12. Defendant Wainwright is a Delaware corporation that maintains its corporate headquarters in New York, New York. Wainwright is recognized as a leading full-service specialty investment bank focused on capital markets and equity research in the Life Sciences and Biotechnology sectors. Wainwright is a small company with less than fifty employees, including 12 research analysts.

13. Defendant Mark Viklund served as Wainwright's Chief Executive Officer ("CEO") and primary contact for Wainwright's Investment Banking Services and Research Services.

14. Defendant Viklund, by reason of his status as CEO of Wainwright, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act. Viklund possessed the power and authority to control the contents and timing of the

reports disseminated by Wainwright's analysts, including Livnat. Therefore, Viklund had access to the Note and the Report alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Similarly, Viklund possessed the power and authority to control and/or negotiate the contents of all underwriting or exclusive placement agreements between Wainwright and other companies, including MannKind's Offering. Because of Viklund's access to material non-public information, Viklund knew that the adverse facts specified herein were not disclosed to, and thus concealed from, the public, and that the positive representations being made were materially false and misleading.

15. Defendant Livnat is a Managing Director and Securities Analyst at Wainwright focusing on specialty pharmaceuticals equity research. Livnat was the primary author of Wainwright's October 10, 2017 Report concerning MannKind.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Registered Direct Offerings

16. A company can register a public offering by filing a shelf registration statement on a Form S-3, a "short-form" registration, pursuant to Rule 415 of the Securities Act of 1933 ("Securities Act"). Companies file shelf registration statements when the issuer does not intend to immediately sell its securities. David Lynn, et al., *Jumping Through the Market Window: The Value of a Shelf Registration Statement*, American Bar Assocation (Aug. 2010), https://www.americanbar.org/publications/blt/2010/08/04_lynn.html. Thus, under Rule 415, after the SEC has declared the registration statement effective, the issuer may conduct a public offering by taking the securities "off the shelf," and filing a prospectus supplement, which sets forth specific terms of the offering. Jeffrey Cahlon, *Utilizing A "Shelf" Registration Statement for a Follow-On Public Offering*, Sichenzia Ross Ference Kesner LLP

(2015), http://srfkllp.com/utilizing-a-shelf-registration-statement-for-a-follow-on-public-offering/.

17. Companies with an effective shelf registration statement often conduct registered direct offerings if they are interested in raising capital quickly. Registered direct offerings are "privately negotiated sales of securities by public companies." Alan Berkeley, et al., *PIPES Hedging Under Scrutiny*, SM101 ALI-ABA 797, 937 (2007) (citing *SEC v. Crestview Capital Partners, LLC*, No. 07-cv-1090, 2007 WL 580797 (N.D. Ill. Feb. 26, 2007)).

18. An issuer conducting a registered direct offering hires a placement agent to market the issuer's offering to potential investors. If an issuer engages with a placement agent on an exclusive basis, the company is agreeing that it will not use any other placement agent for that offering. Arina Shulga, *Placement Agents: Part 1: What Are They, What Do They Do and on What Terms?*, LexisNexis Legal Newsroom Banking and Finance, (Oct. 5, 2015, 02:27 PM), https://www.lexisnexis.com /legalnewsroom/banking/b/venture-capital/archive/2015/10/05/placement-agents-part-i-what-are-they-what-do-they-do-and-on-what-terms.aspx. The placement agent's fee is usually between 3% and 6% of the aggregate proceeds raised during the offering.

19. A placement agent in a registered direct offering is acting as a distribution participant and would be considered a statutory underwriter under Sections 11 and 12(a)(2) of the Securities Act. Securities Act of 1933, 15 U.S.C. § 77a (1933); Anna Pinedo and James Tanenbaum, *Frequently Asked Questions About Registered Direct Offerings*, Morrison Foerster LLP (2017), https://media2.mofo.com/documents/faqsregistereddirect.pdf. Section 11 imposes liability for material misstatements or omissions of material fact in a registration statement, and Section 12(a)(2) extends liability beyond the categories of persons

specified in Section 11 to any person who offers or sells securities through a prospectus or oral communication. 15 U.S.C. §§ 77k, 77l, and 77a.

20. Pursuant to Sections 11 and 12(a)(2) of the Securities Act, when a placement agent is first retained by a company, it will perform voluminous due diligence on the company to confirm the accuracy and adequacy of disclosures in the company's registration statement and prospectus. Latham & Watkins LLP, *The Bought Deal Bible: A User's Guide to Bought Deals and Block Trades*, Client Alert, No. 1305, 9 (Mar. 15, 2012), *available at* https://www.lw.com/thoughtLeadership/the-bought-deal-bible. Due diligence includes "an auditor's comfort letter,[1] opinions of the issuer's and the agent's counsel, negative assurance letters from counsel, 'closing' certificates from the issuer, and conference calls with the issuer's management." Jeffrey Hartlin & Michael Zuppone, *Capital Raising Alternatives for Public Companies in the Current Environment*, Paul Hastings, 4 (July 2009), https://www.paulhastings.com/docs/default-source/PDFs/1372.pdf.

21. Upon completion of adequate vetting of the company, the placement agent selects specific buyers believed to be well suited for the potential investment. Muazzin Mehrban, *Registered Direct Offerings*, Graubard Miller, (April 2010), https://www.graubard.com/Financier-Worldwide-April-2010.pdf. A disclosure package, containing the preliminary prospectus and pricing term sheet or pricing supplement, will be made available to prospective investors before the offering to help investors determine whether or not to buy the issuer's securities. Practical Law

[1] The issuer's independent public accounting firm delivers a "comfort" letter to the underwriters in which the accountants provide to the underwriters assurances as to the financial information included and incorporated by reference in the registration statement. Generally, the comfort letter is not officially delivered until the underwriting agreement, but underwriters often want to see a final draft prior to the launch of the offering. Michael Rave, *Understanding Registered Securities Offerings Post IPO*, Law 360 (Oct. 3, 2013, 04:12 PM ET), https://www.law360.com/articles/477744/understanding-registered-securities-offerings-post-ipo.

Corporate & Securities, Practical Law Practice Note 4-380-7917, *Due Diligence: Securities Offerings*, (Feb. 1, 2018). Targeted marketing, through a limited number of one-on-ones and conference calls, generally occurs over a three-day time period. Stanley Keller, *Integration of Private and Public Offerings Update*, ABA Sect. of Bus. Law 2010 Annual Meeting, 58 (Aug. 9, 2010), available at https://www.americanbar.org/content/dam/aba/publications/blt/2010/11/inside-buslaw-integration-offerings-201010.authcheckdam.pdf (citing Morrison & Foerster, *Exempt and Hybrid Securities Offerings*, 24 (2010).

22. The "most time-consuming" tasks of this process are the negotiation of the placement agency agreement and the prospectus supplement, including determining the offering price. Hartlin & Zuppone, *supra*, at 4. The negotiated offering price is typically an agreed-upon discount to the market price in part because a discounted offering price incentivizes investors to purchase the newly issued shares. Kevin Pollack, *The Case for Registered Direct Offerings*, Seeking Alpha, (Feb. 14, 2010, 09:15 AM ET), https://seekingalpha.com/article/188523-the-case-for-registered-direct-offerings ("RDOs typically involve a company selling registered stock to investors at a below market price"); *What Happens to the Share Price When New Shares Are Issued?*, The Motley Fool, https://www.fool.com/knowledge-center/what-happens-to-the-share-price-when-new-shares-ar.aspx (last visited Feb. 27, 2018) ("To entice buyers to participate in the secondary offering, companies typically offer to sell their shares at a discount to the current market value.") After all, if the Offering price was not discounted from the market price, investors could simply purchase their shares on the open market. Thus, the offering does not get priced until after the close of the last trading date before the offering price is announced. Because the actual price cannot be set until the market closes, the parties will establish a formula for pricing the offering so that the company can readily file a prospectus supplement and announce the offering after the close.

23. After the issuer and placement agent have negotiated the formula for pricing the offering and established the final terms of the transaction, the issuer and placement agent enter into a placement agency agreement. Hartlin & Zuppone, *supra*, at 4. Upon determining the price of the offering, the issuer files a prospectus supplement to the registration statement and preliminary prospectus pursuant to Rule 424(b) of the Securities Act, which describes the final terms of the offering, including the number of shares to be sold and their sale price, the identity of the placement agent, and the actual "plan of distribution" of the securities to be sold in the offering. *Id*. The issuer will not announce the registered direct offering until the transaction is priced. Berkeley, *supra*. The offering is generally announced at least three to five days after the transaction launch. Keller, *supra*, at 9.

**B. Overview of Wainwright and Its History with MannKind**

24. Founded in 1868, Wainwright is recognized as a leading full-service specialty investment bank focused on capital markets and equity research in the Life Sciences and Biotechnology sectors. *H.C. Wainwright Analysts Earn Number One Rankings in 2017 Thomson Reuters Analyst Awards*, Business Wire, (July 24, 2018, 08:00 AM ET), https://www.businesswire.com/news/home/20170724005355/en/H.C.-Wainwright-Analysts-Earn-Number-Rankings-2017. With a team comprised of scientific and financial experts, Wainwright is dedicated to the advancement of medical breakthroughs across all areas of the Life Sciences sector. Between 2002 and 2016, PlacementTracker[2] ranked Wainwright the No. 1 Placement Agent consecutively. In July 2017, Wainwright's analysts earned No. 1 rankings within the Biotechnology sector for stock picking and for earnings estimates. *Id.*

25. Wainwright provides investment research on MannKind, among other companies. MannKind is a publicly-traded biopharmaceutical company

[2] PlacementTracker, part of the Business Intelligence Division of Informa PLC, is recognized as the leading provider of research, data, and analytics covering the private investment in public equity ("PIPE") and private placement markets.

headquartered in Westlake Village, California. Michael Castagna serves as the CEO of MannKind. MannKind is actively traded on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "MNKD." According to MannKind's 2017 second quarter report, filed with the SEC on August 7, 2017, MannKind had 82.6 million shares in its trading float as of August 1, 2017. MannKind researches, develops, and commercializes inhaled therapeutic products for patients with diseases such as diabetes and pulmonary arterial hypertension. Afrezza is MannKind's first and only FDA-approved product. Afrezza is a rapid-acting, inhaled insulin used to control high blood sugar in adults with Type 1 and Type 2 diabetes.

26. Wainwright has a long-standing, interlaced history with MannKind. Rodman & Renshaw, LLC ("Rodman"), a division of Wainwright focused on healthcare research, served as the co-manager for MannKind's public offering of 8,360,000 shares in August 2009. MannKind retained Rodman again as the exclusive placement agent for its $50 million direct offering of common stock and warrants in May 2016. In addition, a number of former Rodman employees, who worked at the firm when Rodman provided investment banking services to Mannkind, went on to join the Wainwright team. James Cappucio, the former Vice President of Rodman, now serves as the Managing Director of Investment Banking at Wainwright. Craig Schwabe, a former Managing Director of Investment Banking for Rodman between 2006 and 2012, now serves as a Managing Director at Wainwright. Michael Mirsky, a former Managing Director in the Healthcare Investment Banking Unit at Rodman between 2008 and 2013, now serves as the Managing Director of Wainwright's Health Care Investment Banking Unit. Swayampakula Ramakanth covered biology technology companies at Rodman, and now serves as the Senior Healthcare Analyst at Wainwright. Because these former Rodman employees oversaw Rodman's dealings with MannKind, Wainwright's team now possesses unique insight on MannKind's growth as a company, and the evolution of its products.

**C. Wainwright Initiates Coverage on MannKind and Executes Underwriting Agreement on the Same Day**

27. MannKind's average daily trading volume during the three months immediately prior to October 10, 2017 was approximately 5 million shares.

28. There were no major announcements by or concerning MannKind or its business in the three-days before October 10, 2017.

29. On October 9, 2017, MannKind's stock closed at $5.33 per share, on trading volume of 13.22 million shares.

30. On October 10, 2017, at 4:03 AM Pacific Time (7:03 AM Eastern Time), before the markets opened, Wainwright, through the Note, authored by Livnat, initiated coverage of the MannKind stock with a "Buy" rating and a $7 per share price target, which was more than 30% above the stock's prior day closing price. Livnat did not provide a time period for this $7 price target.

31. At 6:17 AM Pacific Time (9:17 AM Eastern Time), Wainwright published the full Report on MannKind, authored by Livnat, repeating the $7 per share price target. Again, Wainwright did not correlate the price target with a specific time period (*i.e.*, 12 months), which is inconsistent with industry practice.

32. The unqualified $7.00 price target was misleading for failure to disclose that in less than a day, MannKind would announce a dilutive Offering of 11.8% of MannKind's float for a price that was significantly below that target.

33. The Report stated, "… we and the market expect a near-term recapitalization." Oren Livnat, *A Breath of New Life with Afrezza Turnaround Story; Initiate with Buy and $7 Target*, H.C. Wainwright & Co, 21 (Oct. 10, 2017). The Report repeated later that Wainwright expected "near-term recapitalization and dilution" would occur. The Report added, "[r]ecapitalizing the company is a primary objective new MannKind management [*sic*], and we expect near-term equity and debt financing to fund continued operations…" *Id.* at 22. Through these statements, Defendants led the investing public to believe that Wainwright knew no more than

the market did with respect to MannKind's future financial transactions, when in fact Wainwright knew that the highly dilutive Offering at a discount to market price would be announced after the close of trading on that very day.

34. In addition, Wainwright included a series of "Important Disclaimers" in the Report. Among these, Wainwright disclosed that Wainwright "will seek compensation from the companies mentioned in this report for investment banking services within three months following publication of the research report." *Id*. at 27. This vague reference to Wainwright working on an investment banking deal for Mannkind in the next three months did not reveal to investors that, in fact, Wainwright was already providing services in connection with, and engaged to do an Offering for MannKind shares, representing 11.8% of MannKind's float, at a price materially below the target price and market price, and knew MannKind would announce the deal that night.

35. Other than the Offering referenced herein, Wainwright did not provide any other investment banking services for MannKind during the subsequent six months. Thus, the Report could only have been referring to the Offering that was announced less than a day after the Report was issued.

36. The Report was widely available and repeatedly quoted on a number of well-known financial websites, including Nasdaq, SmarterAnalyst, The Motley Fool, and Benzinga. *See U.S. Stocks on the Move – P&G, Wal-Mart, UAL, MannKind, Roka Bioscience*, Nasdaq (Oct. 10, 2017; 2:05 PM), *Why MannKind, Nutanix, and Smith & Nephew Jumped Today*, The Motley Fool (Oct. 10, 2017, 04:30 PM ET) ("Analysts at H.C. Wainwright opened their coverage of MannKind by giving it a buy rating, setting a $7-per-share price target that helped prompt the latest surge in the stock.); Lisa Levin, *Mid-Day Market Update: Crude Oil Up 2.7%; MannKind Shares Spike Higher*, Benzinga (Oct. 10, 2017, 12:09 PM ET) ("H.C. Wainwright initiated coverage on MannKind with a Buy rating and a $7.00 price target.").

37. Like the analysts who valued Wainwright's coverage on MannKind, the investing public also had reason to believe there was a basis for Wainwright's price target and Report. After all, Wainwright, through its healthcare research unit, had a history of investment banking deals with MannKind and was engaged to do another deal within the next three months.

38. As alleged below, Defendants were motivated to issue the misleading statements in order to drive up the price of MannKind stock in advance of the Offering. Wainwright's $7 per share price target and Buy rating for MannKind prompted a surge in the stock and trading volume. MannKind shares rose approximately 26% on October 10, 2017 to close at $6.71, and the shares traded as high as $6.96 in intraday trading. Further, Mannkind's trading volume that day ballooned to 48.23 million shares—more than three times higher than the previous day, and more than nine times the three-month average.

39. At 9:02 PM Pacific Time on October 10, 2017 (12:02 AM Eastern Time on October 11, 2017), MannKind announced a registered direct offering of an aggregate of 10,166,600 shares of common stock (*i.e.*, approximately 12% of the float) at an offering price of $6.00 per share (*i.e.*, more than 14% below the price target in the Report and more than 10% below the market price) for gross proceeds of approximately $61 million. The announcement also revealed that Wainwright – the very firm that initiated coverage of MannKind earlier that same day with a $7.00 price target – would serve as the exclusive placement agent on the Offering, pursuant to a Placement Agency Agreement signed by Defendant Viklund on behalf of Wainwright and Castagna on behalf of MannKind. Pursuant to that agreement, MannKind agreed to pay Wainwright a cash fee equal to 5.0% of the aggregate gross proceeds in the offering for its services.

40. On the news of MannKind's direct offering of 11.8% of MannKind's float for a price per share 10.6% below the last closing price (and more than 14%

below Wainwright's target price), MannKind's stock price plummeted 18.5% from $6.71 to a close of $5.47 per share on October 11, 2017, on trading volume of 33.6 million shares.

41. This was not surprising. Announcement of an offering of shares equal to more than 10% of the float at a price that is more than 10% below the trading price would typically dilute the value of the shares and would be expected to cause an immediate stock price decline. *What Happens to the Share Price When New Shares Are Issued?*, The Motley Fool *supra*,("The downside of secondary offerings is that they often send a stock's price lower."); Dan Caplinger, *Secondary Offerings: What You Need to Know*, The Motley Fool (Feb. 25, 2013, 11:13 AM ET), https://www.fool.com/investing/general/2013/02/25/secondary-offerings-what-you-need-to-know.aspx (explaining that with a dilutive offering, investors' stock position "represents less of the overall company," and the investor gets a "proportionately smaller share of the company's profits going forward.")

42. MannKind filed a prospectus supplement, dated October 10, 2017, with the SEC on October 11, 2017, pursuant to Rule 424(b)(5). The prospectus supplement accompanied the Form S-3 registration statement and preliminary prospectus filed with the SEC on April 18, 2016 and took effect on April 27, 2016. The prospectus supplement detailed the terms of the Offering, which included the offering price, placement agent, and length of offering. Among the information disclosed by MannKind in the prospectus supplement was the fact that each share in the Offering was sold "at a negotiated price of $6.00." Prospectus Supplement (Form 424B5) (Oct. 11, 2017).

43. MannKind's announcement that Wainwright would be the exclusive placement agent for the 10,166,600 shares direct offering was not well-received. For example, Stat News biotech reporter Adam Feuerstein "took a jab at H.C. Wainwright for its bullish commentary on the stock ahead of a major offering." Wayne Duggan,

*A Deep Dive Into MannKind's Big Bet On Afrezza*, Benzinga (Oct. 11, 2017, 11:45 AM ET), https://www.benzinga.com/analyst-ratings/analyst-color/17/10/10165957/a-deep-dive-into-mannkinds-big-bet-on-afrezza.

44. As a result of Defendants' omissions, which rendered their public statements materially misleading, MannKind's common stock traded at artificially inflated prices during the Class Period. However, after the public learned of the above revelations, MannKind's share price declined significantly, causing economic harm and damages to member of the Class.

**V. ADDITIONAL SCIENTER ALLEGATIONS**

45. Scienter is supported because at the time Livnat and Wainwright issued the Note and the Report, Defendants knew the full undisclosed truth – that less than a day later, MannKind would announce an Offering of 10,166,600 shares (nearly 12% of MannKind's trading float) at a negotiated price that would be materially less than the target price set forth in the Note and the Report.

46. Knowledge of the fraud alleged herein is evidenced by the fact that the final terms of the Offering were announced publicly on October 10, 2017. Thus, Wainwright had to have already reviewed the preliminary prospectus, satisfied its due diligence obligations, marketed the Offering to investors, completed negotiations with MannKind, signed off on the final Offering document, and negotiated and established a formula for pricing the offering. *See supra* ¶¶ 19-23. As stated earlier, common stock registered direct offerings take at least three to five days post transaction launch. *See supra* ¶ 23. Given Wainwright's obligations as placement agent for the Offering, Wainwright knew of the Offering at least three to five days before it was publicly announced. Indeed, Wainwright's disclosure in the Report that it will seek compensation from MannKind for investment banking services within the next three months is an admission that Defendants were aware of the Offering at the time that

the Report was issued (as the Offering was the only investment banking transaction that Wainwright performed for MannKind in the six months following the Report).

47. Defendant Viklund also knew that the Report was materially misleading due to its failure to disclose the complete facts. Viklund is the primary contact for Wainwright's Research team, and therefore oversaw the research compiled for the Report, as well as its issuance. Similarly, Viklund is the primary contact for Wainwright's Investment Banking team, and therefore knew, or was deliberately reckless in disregarding, that Wainwright would serve as MannKind's placement agent for the impending Offering that was to be announced just hours after the Report was issued. Based on his role in both divisions, Viklund knew: (1) the price target that was set forth in the Note and the Report; (2) the formula for pricing the offering; (3) the Report's vague reference to a deal between MannKind and Wainwright over the next three months; (4) the Report's expectation of "near-term recapitalization;" and (5) the timing of the Offering, and of MannKind's public announcement of the Offering.

48. Further, because Wainwright would receive compensation for its role as MannKind's exclusive placement agent, Wainwright possessed substantial motive for artificially inflating MannKind's market price and concealing its knowledge of the Placement Agency Agreement and Offering. According to the Placement Agency Agreement that set forth Wainwright's role in the Offering, MannKind agreed to pay Wainwright a cash fee equal to 5.0% of the aggregate gross proceeds raised in the Offering. MannKind/H.C. Wainwright Co. Contract for Underwriting (Oct. 10, 2017), *available at* https://www.sec.gov/Archives/edgar/data/899460/000119312517307989/d465696dex992.htm. In light of the fact that the negotiated offering price is typically an agreed-upon discount to the market price, this agreement, and the accompanying 5% fee, incentivized Wainwright to deliberately inflate MannKind's stock price just before the Offering in order to justify an increase in the Offering price,

and thereby increase Wainwright's commission from the Offering, as the Offering price was correlated to the last reported sale price of MannKind's stock. MannKind Corp., Prospectus Supplement (Form 424B5) (Oct. 10, 2017), *available at* https://www.sec.gov/Archives/edgar/data/899460/000119312517307995/d473688d424b5.htm .

49. Additionally, MannKind stated in the Prospectus Supplement, "there is no minimum offering amount required as a condition to closing in this offering," which made it possible for the proceeds to be "substantially less than the total maximum offering amounts" set forth. *Id*. Given Wainwright's stake in the proceeds, it was in Wainwright's interest to generate buying activity at an artificially inflated price to ensure a profitable offering.

50. Finally, it is expected that a registered direct offering of shares that represent a large percentage of a company's stock at a substantial discount to the stock's trading price would have a negative effect on the company's stock's price. W.H. Mikkelson and M.M. Partch, *Valuation Effects of Security Offerings and the Issuance Process*, 15 J. FIN. ECON., 59 (1986), *available at* http://lcb-file.uoregon.edu/wmikkels/Security%20Offerings%20paper%201986%20JFE.pdf. ("Adjusting for the potential effect of amount of financing or offering size, common stock and convertible debt offerings are associated in general with an incremental negative valuation effect."); *id.* at 49 (explaining that "the announcement of the offering conveys to market participants that in managers' view the shares are overpriced"). As expected, MannKind's announcement of its 10,166,600 share Offering on October 10, 2017 provoked a negative market reaction such that the share price declined 18.5% to close at $5.47 on a trading volume of 33.6 million shares. For an investment bank with vast experience acting as a placement agent in direct offerings, Wainwright knew, or recklessly disregarded, that MannKind's

announcement of the Offering would negatively affect the share price. And yet, Wainwright set a $7.00 price target earlier that day.

51. Taken collectively, the facts alleged herein support a strong inference of scienter.

## VI. LOSS CAUSATION

52. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MannKind common stock and operated as a fraud or deceit on Class Period purchasers of MannKind common stock. Defendants' misleading Note and the Report caused a prompt appreciation in MannKind's stock price to artificially inflated levels. When the previously-concealed details concerning the dilutive Offering were disclosed on October 10, 2017, the price of MannKind common stock fell precipitously as the prior artificial inflation came out of MannKind's stock price.

53. As a result of their purchases of MannKind common stock during the Class Period, Lead Plaintiffs and the other Class Members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' misleading statements had the intended effect and caused MannKind common stock to trade at artificially inflated levels during the Class Period. MannKind stock closed at $5.33 on October 9, 2017, the day prior to Defendants' issuance of the Note and the Report, and rose as high as $6.96 per share (a gain of 31%) before closing at $6.71 (a gain of 26%) the next day, on a volume of 48 million shares, 9.6 times the average trading volume of the prior three months.

54. There was no other news on MannKind on October 9, 2017, or October 10, 2017 before MannKind's Press Release was issued at 9:02 PM Pacific Time. In fact, between October 6, 2017, and October 9, 2017, there were no major announcements by or concerning MannKind. The increase in MannKind's stock on October 10, 2017 cannot be attributed to market or industry factors either. On this

day, the Dow Jones Industrial Average rose 0.3%; the S&P 500 rose 0.2%; and the Nasdaq Composite Index finished only 0.1% higher. While the three market benchmarks saw minimal gains, Wainwright rose a staggering 26%. Thus, it is clear that the dramatic increase in MannKind's stock price on October 10, 2017 was caused by the Note and the Report.

55. Wainwright's coverage of MannKind carried special weight with investors because of Wainwright's reputation as a leading specialty investment bank in the healthcare industry as well as its longstanding relationship with MannKind. A unit of Wainwright co-managed and served as the exclusive placement agent for two of MannKind's prior registered offerings. The individuals who worked at that unit during these offerings later joined the Wainwright team. Further, in the Report, Wainwright disclosed that yet again it was retained to provide investment business services for MannKind within the next three months. Given Wainwright's years of experience working with MannKind, investors justifiably believed that Wainwright was privy to looks "under the hood" of MannKind, and relied heavily on Wainwright's opinion, allowing the investment bank to drive up the price of the stock with ease.

56. When the facts concealed by Defendants were publicly revealed, the MannKind stock price declined just as quickly as it had risen in response to the misrepresentations made a day earlier. Specifically, on October 11, 2017, the first trading day following the announcement of MannKind's Offering of 10,166,600 shares (11.8% of the float) at $6.00, the stock price plummeted 18.5% to close at $5.47 on a trading volume of 33.6 million shares. The decline cannot be attributed to market or industry factors. In fact, after the close on October 11, 2017, "the Dow Jones Industrial Average was up 42 points; the broader S&P 500 Index was ahead nearly five points; and the NASDAQ was higher by 16 points." Harvey Katz, Mario Ferro, and Adam Rosner, *Stock Market Today: October 11, 2017*, Value Line (Oct.

11, 2017), http://www.valueline.com/Markets/Daily_Updates/Stock_Market_Today__October_11,_2017.aspx#.WpXhxlGGPcs. Thus, the corrective disclosures alone caused the decline.

57. The declines in the price of MannKind common stock detailed herein removed the inflation and caused real economic loss to investors who had purchased MannKind common stock during the Class Period. This economic loss was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.

## VII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

58. The market for MannKind securities was open, well-developed and efficient at all relevant times. The market for MannKind stock was efficient for the following reasons, among others:

a. MannKind's stock met the requirements for listing and was listed and actively traded on NASDAQ, a highly efficient and automated market.

b. As a regulated issuer, MannKind filed periodic public reports with the SEC and/or NASDAQ.

c. MannKind regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

d. MannKind was followed by securities analysts employed by brokerage firms including Wainwright, Maxim, and JP Morgan, who wrote reports about MannKind just prior to and/or during the Class Period. These reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

59. Based on the foregoing reasons, during the Class Period, the market for MannKind stock promptly digested information regarding MannKind from all publicly available sources and impounded such information into the price of MannKind stock. Under these circumstances, the market for MannKind securities was efficient during the Class Period and, therefore, investors' purchases of MannKind stock at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

60. In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## VIII. NO SAFE HARBOR

61. Defendants are liable for any false or misleading forward-looking statements ("FLS") pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by Wainwright who knew that the FLS was false.

## IX. CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired MannKind securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Wainwright, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants has or had a controlling interest.

63. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MannKind stock was actively traded on NASDAQ. While the exact number of Class Members is unknown to Plaintiff at

this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Millions of MannKind shares were traded publicly during the Class Period on NASDAQ. According to MannKind's 2017 second quarter report, filed with the SEC on August 7, 2017, MannKind had 104.68 million shares of common stock outstanding as of August 1, 2017. On October 10, 2017, more than 48 million shares of MannKind traded. Record owners and other members of the Class may be identified from records maintained by MannKind or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64. Plaintiff's claims are typical of the Class Members, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

65. Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel competent and experienced in class actions and securities litigation.

66. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' conduct alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of MannKind; and

c. to what extent Class Members have sustained damages and the proper measure of damages.

67. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. COUNTS

### FIRST COUNT
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Wainwright and Livnat

68. Plaintiff repeats and realleges each allegation set forth above as if fully set forth herein.

69. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class Members, as alleged herein; and (ii) cause Plaintiff and other Class Members to purchase MannKind stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

70. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made statements that omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MannKind's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

71. Defendants, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated

in a course of conduct to conceal adverse material information about MannKind's prospects, as specified herein.

72. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, statements that omitted material facts necessary in order to make the statements made about MannKind, its prospects, and Wainwright's investment banking relationship with MannKind, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MannKind's securities during the Class Period.

73. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MannKind's planned direct offering below the market price from the investing public and supporting the artificially inflated price of MannKind's securities. As demonstrated by Defendants' misstatements throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged, Defendants were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were misleading.

74. As a result of the dissemination of the materially misleading information and/or failure to disclose material facts, as set forth above, the market price of MannKind was artificially inflated during the Class Period. In ignorance of the fact that market prices of MannKind's securities were artificially inflated, and relying directly or indirectly on the misleading statements made by Defendants, or upon the

integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other Class Members acquired MannKind stock during the Class Period at artificially high prices and were damaged thereby.

75. At the time of said misrepresentations and/or omissions, Plaintiff and other Class Members were ignorant of their falsity and believed them to be true. Had Plaintiff and the other Class Members and the marketplace known the truth about MannKind's direct offering, which was not disclosed by Defendants, Plaintiff and other Class Members would not have purchased or otherwise acquired their MannKind securities. If they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of MannKind's securities during the Class Period.

## SECOND COUNT
## Violation of Section 20(a) of The Exchange Act Against Defendant Michael Viklund

78. Lead Plaintiff repeats and realleges each and every allegation above as if full set forth herein.

79. During the Class Period, Defendant Viklund participated in the operation and management of Wainwright, and conducted and participated, directly and indirectly, in the conduct of Wainwright's business affairs. Viklund also served as the primary contact for Wainwright's Research Department and Investment Banking team. Because of his senior position, he knew of the adverse non-public information

regarding Wainwright's Placement Agency Agreement with MannKind, and Mannkind's Offering.

80. As CEO of a publicly owned company, and by reason of his position of power and authority as senior officer, Viklund did control the contents of the Note and the Report disseminated in the marketplace during the Class Period and had a duty to correct promptly any public statement issued by Wainwright and analysts, such as Livnat, under his control which had become materially false or misleading.

81. By reason of the above conduct, Viklund is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Wainwright and Livnat.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and all other Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 27, 2018

By: /s Robert V. Prongay

GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Jonathan M. Rotter (#234137)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

*Liaison Counsel for Lead Plaintiff and the Proposed Plaintiff Class*

KIRBY McINERNEY LLP
Peter S. Linden
Ira M. Press
Thomas W. Elrod
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: plinden@kmllp.com

FISHMAN HAYGOOD LLP
James R. Swanson
Jason W. Burge
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: jswanson@fishmanhaygood.com

*Co-Lead Counsel for Lead Plaintiff and the Proposed Plaintiff Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On February 27, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 27, 2018, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 2:17-cv-07926-JAK-AS Daniela Prodanova v. H.C. Wainwright and Co., LLC et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jay S Auslander**
  jauslander@wilkauslander.com
- **Jason W Burge**
  jburge@fishmanhaygood.com,rhamilton@fishmanhaygood.com
- **Thomas W Elrod**
  telrod@kmllp.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Adam Itzkowitz**
  aitzkowitz@wilkauslander.com
- **Kathryn J Johnson**
  kjohnson@fishmanhaygood.com
- **Peter S Linden**
  plinden@kmllp.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com
- **Ira M Press**
  ipress@kmllp.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Paul Benedict Salvaty**
  paul.salvaty@hoganlovells.com,ladocketing@hoganlovells.com
- **James R Swanson**
  jswanson@fishmanhaygood.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`